May it please the Court, Linnea Johnson for Mr. Holmes, Central California Appellate Program. I'd reserve three minutes for rebuttal. This is the case of the sins of the son being visited on the father through the execution of a search warrant based on stale information and in which the son, not the father, was the target of the investigation. The execution of the search warrant led to an illegal search of the father merely because his son was an occupant of his home. On November 22nd of 2007, Sacramento County Sheriff's Department responded to a 911 call about a shooting at a local high school. Sheriff's Office quickly responded to the scene where they interviewed four percipient witnesses and the victim, CSI processed the crime scene the same day, found seven rounds of 45-millimeter casings and five rounds of 9-millimeter casings. They took down the license plate numbers of cars leaving the scene, and these included the license plate number of an orange car. One percipient witness had observed that car leaving the scene at a high rate of speed, and another had observed one of the shooters getting into that orange car. I think we're familiar with the factual background, if you don't mind. Right. Once you launch in, if you will, if you don't mind, right into the substance of the argument. I will. Why don't you first talk about the staleness of the warrant, if you don't mind. Okay. The warrant was not executed, as you know, until May 6th. It was applied for and granted on May 1st. This is a period of 5.5 months after the shooting. So how do you distinguish Dozer, which proved a warrant that was about 5-1⁄2 months was stale? Well, Dozer involved an ongoing criminal enterprise, which was cultivation of marijuana. And this Court has recognized in the context of stale warrants ongoing criminal enterprises. But what about firearms possession? Isn't it fair to infer that people, particularly where there's a suggestion at least of gang involvement, gang-related activity, that the likelihood is quite substantial that the person who had a firearm 5 months ago is likely to have a firearm today? Well, that cuts right to the chase, Judge. And the issue here is the allegation in the warrant was that persons who commit assaults with weapons frequently hide them in their homes, their offices, their cars, et cetera. That wasn't a gang-based allegation. Now, the First Circuit in the Charest case has said it is common sense that when a crime is committed with a gun, the first thing you do is ditch the gun. And so in that case, the First Circuit said 16 days may be information stale. Can an issuing magistrate or judge under all these circumstances reach that conclusion? Well — Well, I think that, you know, I'm not sure whether or not it was specifically gang-based. Where are the circumstances? Somebody said you'd better get out of here because there's going to be a battle. Shots heard from different sides. Well, I think — Different shell casings found. And simply draw the inference that it's more likely than not or it's probable, that's all we need to know. Yeah. That individual believed to have a gun then. Yeah. There's probable cause to believe he has it today. It's a continuing possession. And what's unreasonable or impermissible about the issuing magistrate having drawn that conclusion? Well, the allegations in the search warrant affidavit are really insufficient to draw that conclusion. The district court judge here made several findings which would have been great if they had been provided by the expertise of the officer in the search warrant affidavit, but they weren't. And these findings were street gangs operate in a continual stream of criminal activity, violent confrontations require arming themselves with firearms, that firearms are valuable tools for criminal street gangs, making it unlikely they will want to part with their guns, especially when there is no clear evidence as to who the gun belonged to or that it caused the injury to the victim. Now, if this Court finds that the bare-bones allegations in this affidavit justified the district court in making these inferences, then, indeed, we've got — we've got sufficiency to say that there is gang activity involved here. But what we don't have and what the judge doesn't provide here is a temporal bracketing of that finding the gun or keeping the gun and hiding the gun. You know, is it the case that you can draw the inference that a gun that was used in a shooting would be hidden in the home and kept there in perpetuity? I don't think that's a rational conclusion to draw from the bare-bones allegations here. All we have saying that these guys were bloods are the statement of one percipient witness who was only identified as Natty and no collaboration of it. You know, in Sacramento County, they keep lists of validated gang members. The two boys who were the subject of the target of this investigation that were listed as residing at that home by probation, probation would certainly have known if they were validated gang members. There were many options available to the defiant here. Well, I'm not so sure that's correct with — had they been on probation before? Is that what you're saying? Yes. That's how they found out they were occupants of the home. They ran a probation search of anyone who listed that home as their residence, and the police then turned up the names of Clarence and Terrence. So it would have been an easy process from there to look at their probation reports or talk to their probation officer. So there was very, very minimal investigation done in here to present this. So it's our position that based on the four corners of the warrant affidavit and what can be reasonably inferred, and that will be the judgment of this Court, that the warrant fails to establish that a gun used in a shooting, gang-related or not, is likely to be found in the shooter, in the home of the shooter, 5.5 months after the shooting, and looking to the First Circuit's Charest case to say that. Do you want to get to the detention? I want to make sure you cover your points. I will get to the detention now. On the morning of May 6th at 10 o'clock, Mr. Holmes was leaving his front door to walk to his van to get in his car. He's 45 years old, and seven officers converge on him from the side of his house. Yelling, stop, get down. The officers were executing a search warrant for the residence and the orange car, but Mr. Holmes was not the target of that search. It was his son. Now, Mr. Holmes, in meeting this situation, he's six feet out of his front door, according to Deputy Reichenberg, and the police are all converging, armed officers converging on him. He looks in the direction he was walking. He looks back to the officers who are converging on him, and he does essentially a double-take while he's taking a couple more steps. He's processing what is happening to him. He is surprised. Deputy Reichenberg doesn't testify that Mr. Holmes fled or that Mr. Holmes attempted to flee. Deputy Reichenberg testified that from the look on his face, she could tell that he was considering fleeing, and for that reason, they took him down. It is Mr. Holmes' position that the Court should have afforded no weight to Deputy Reichenberg's opinion because she'd failed to establish that she had any expertise in mind reading and that the facts on which she based her mind reading. Kennedy, in her reading of his mind, she was drawing an inference from his appearance based upon her experience. That's correct. And in any event, the rules of evidence, Daubert and so forth, don't apply at a suppression hearing, right? Well, Rule 1101, in fact, does say that. But this Court in USA v. Berber-Tomenko, which I've analyzed in the reply brief, says quite the opposite, that evidentiary error ruling in a suppression hearing is subject to a harmless error analysis. And in this case, it is clear that the Court's finding, based exclusively on Deputy Reichenberg's testimony, was the ratio des indemni for denying the suppression motion, and if you even want to carry that through to the trial, it was also the sole basis on which he was convicted of the possession of the cocaine, of the rock cocaine. So for those reasons, I think that the – whether this Court chooses to treat it as an evidentiary error under the Berber-Tomenko rationale or simply wishes to look at it as saying this is evidence of hunch, and hunch has never been considered the touchstone of reasonable for purposes of Fourth Amendment analysis. So for those reasons, I think that both the warrant was stale because the facts on which it was based were insufficient. Deputy Reichenberg here is really saying the look on his face tells me what he is thinking. I think that was inadequately established, and for that reason, that the suppression motion should have been granted. Kennedy. How is that distinguishable from the more commonplace quote, I saw the defendant make a, quote, furtive gesture? Well, the furtive gesture cases, I think, involve cars most often, where they're going to detain the person. Now, Mr. Holmes was going to be detained no matter what. This was a categorical Michigan v. Summers detention. There's no question about that. The question is, under what conditions do you get to detain someone? Do you get to take them down, handcuff them, and search them? And when you do search them, do you do a terry pat or is the words Deputy Reichenberg used, the little, little, little grabs was how she phrased it, the little grabs, whether those comply with the Dickerson case? Thank you, counsel. We'll hear from the government. Good morning, Your Honors. Jared Dolan on behalf of the United States. I'd like to put the issues before this Court in two categories. One concerns the date of the search and the detention of Mr. Holmes and his subsequent the terry pat down where the cocaine was discovered. And then the second issue concerns the warrant and all the issues attendant to the warrant. Going to the detention first, under Michigan v. Summers, it's obvious that under established law, the police had the right to detain Mr. Holmes, incident to the execution of that search warrant. That right was categorical and it required no further justification. To effectuate that detention under Mueller v. Mina and Gramby-Conner, the police had the authority to use reasonable measures. And the question is what's reasonable?  I think the first thing that comes to mind is the search warrant. The search warrant was a search warrant for a residence in a residential area. This was a search of a residence for dangerous weapons, indicia of gang activity, and they were going in and that was the evidence at hand. In the briefs, counsel drew the distinction that the real target of the search was Terrence Holmes, and so this was somehow different. But that's both legally and factually not true. Legally, it's not true because it wasn't the search of a person. It was the search of a place, the residence. And so today, on that day, the concern of the police was searching the residence. Now, factually, it's not true because the warrant in Mueller v. Mina was exactly the same. It authorized not only the search of the residence, but also the search of the individual gang member that was in question. Now, that's not in the Supreme Court's opinion, but it is in this Court's opinion, Mina v. City of Simi Valley, 226 F 3rd, 1030, excuse me, 1031, 1035. It's exactly the same type of warrant, and so there's no distinction between the two. Because it was for dangerous weapons, the officers were entitled to order the defendant to stop, get on the ground, and handcuff them. Now the handcuffing did escalate the stop. Do you agree with that? Yes, Your Honor. So what objectively was apparent to the officers at the time that would require handcuffing beyond the stop? Well, I would say, Your Honor, first, that the nature of the search in and of itself was enough under Mueller v. Mina. But certainly, the Court could go further if that were not sufficient and look at the defendant's demeanor to make that determination. Deputy Reichenberg cannot read minds. That's not what we're talking about here. She saw the defendant, looked fervently from side to side. She testified that, in her opinion, she thought he was going to run. And those are the types of running. Or he was contemplating it. Contemplating running. And those are the types of split-seconds decisions and expertise that officers rely on every day in their duties. It's exactly the same type of situation in Terry where Chief Justice Rehnquist categorized the officer believing that the bank robbers were thinking about robbing the bank. It's exactly the same situation. I think it was a jewelry store in Terry, but that's neither here nor there. The jewelry store. Whatever. This is something that troubles me a bit. Terry talks about armed and dangerous. And what grounds was there to conclude that Mr. Holmes, once flat on the ground and handcuffed, was armed and dangerous? I can't believe that's what troubles me the most about this case. They went ahead and patted him down, found the cocaine, and here we are. Well, so if I think the things that he's handcuffed, there are eight officers. I assume somebody stayed with him. I don't know the record indicates that, but they're not going to let him stand out alone in a street corner. What made him dangerous? Why, under the precise wording of Terry, are they able constitutionally to frisk him? Your Honor, I think the answer to the question, what the district court actually found, is that if they hadn't found the cracked cocaine in his pockets, he would have been uncuffed and detained in the garage. But my point simply is, why, once he had him handcuffed, how can they frisk him? Where's grounds to consider him either armed, but more importantly, dangerous? He was secured. He was under their control. How can they then pat him down? They're not taking him in for booking him. They're not putting him in a police car. He wasn't going to run. He wasn't going to run. Your Honor, I think it is when you – when the officers – well, let's take a step back and let's determine whether or not before they handcuffed him they thought he would be armed and dangerous. And I think based on the nature of the search and based on his demeanor, they thought he could be. That that was a – But wasn't that the purpose of the handcuffing, to eliminate any potential danger that he might have posed? Well, I think, Your Honor, that if he had, for example, a gun in his pocket, even though he was handcuffed, I think that's risky. I think that's dangerous. I think it is in the best interest of the police officer, and there are cases – Well, let me ask you this. Does the record indicate how he was handcuffed? In front or back? Your Honor, I – He was handcuffed in the back. Let's assume that, Your Honor. If he was handcuffed in the back, then perhaps pat down the back pockets. But why do the full pat-down? I mean, dangerous. That's the basis that they have to – on which they can lawfully conduct a pat-down. And where's the danger here? Your Honor, I think the danger is – is – I mean, if he was – Is this also a categorical situation? Every time you detain somebody, put them in handcuffs, you can pat them down? Because what other indicia did they have that he was armed and dangerous at that time? Your Honor, the only indicia that they had at the time that he was armed and dangerous was the nature of the search and his – and the fact that he was obviously an occupant of it. And his – I'm sorry. I missed that last part. And that he was an occupant of the residence. I apologize. And that he – his demeanor upon exiting the house. That was it. Your Honor, I think the danger here is – is – is that there's a lack of evidence. And this Court has held that absent the – you know. That's enough? That that is – that those factors, I think it's flatter, that some crimes are so typically associated with violence that the belief that an individual is connected to that – those issues is enough standing alone. I guess we don't want to leave the officers at risk even in that situation. Right. And I actually think about Tekel. Tekel is a case where the officers – it was a qualified immunity case where the officers were executing a search warrant. They knew that there was a 10-year-old boy inside the house before they executed it. He came out. He was surprised when they came out. Then he ran back in. He eventually came back out again. They handcuffed him. They frisked him. And part of the Court's rationale for believing that that detention was unreasonable, that he was handcuffed for too long for qualified immunity to attach, is because they frisked him. They should have known that he wasn't armed, and because of his age and because he was in shorts and a T-shirt, they should have uncuffed him right then and there once they realized that. I think it is prudent of the officers to not say, okay, now that he's in cuffs, we can put him – this man to the side and just let him be. What about the search warrant? What about the staleness issue? Your Honor, I think Dozier – I can never pronounce it right, but – It's Dozer, Dozier, or Dozier. So you take your pick. Fair enough. I think it's – actually, I think this case is better because in Dozier, they told the target that he was under suspicion for the crime five and a half months before the search. There was a reason to believe that he was going to get rid of the evidence. Right. But the difference in this case, I think, is that you don't really have an ongoing activity that's at stake here. You have the best – unless you can – unless I'm missing something, you have the possession of firearms. And if that's true, then the logical extension argument is that that warrant is never stale if you presume that people keep firearms. Your Honor, I think there might be a point where it would become stale. I'm not sure. Where is that? I'm not sure. I think when you get to – and I think the Court doesn't need to reach the argument, first of all, because I think, apart from what happens in the Supreme Court with Millender, the staleness issue is saved by good faith. The judge had all the facts, all of the times, of the dates, of when everything happened so that he could make a decision as to whether or not there was probable cause. Well, perhaps so, but we're talking about just the staleness issue in isolation. Five and a half months is pretty stale, I think, for a firearms warrant. And I would agree with the Court if this were just – if this were just a random shooting, if it was a one-off incident. But I think if – looking at the facts, the idea that this was not gang-related, I suppose you could say that the only specific example of – What did the warrant say in reference to the underlying incident? Say that again, Your Honor. What did the – what did the application for the warrant say with regard to the underlying incident, the probable cause showing? Your Honor, as to the gang-related, it said that two of the individual – individuals that were arguing were bloods. But it also said the fact that – Your Honor said earlier was that there – that as they were driving by, they saw individuals with guns putting them – putting the guns in a car and saying, you know, get out of here, get out of here. There's going to be a battle. This was not a chance dispute. This was a – And shooting on both sides of the stadium? On Thanksgiving Day at a school. And further, another thing that – that weighs in favor of the warrant not being stale is there was no gun identified as being the one that fired the shot that hurt Eric McMeans. There was no gun identified at all. Some of the guns were identified with some specificity.   Some of them were just basic chromo… Handguns. Handguns. Others were just firearms. Specifically, when they said that there were groups of – a group of three or four individuals putting guns into an orange car, they weren't described with any specificity. And especially when we're dealing with children at a high school. I think officers would be remiss in relying on scattershot identifications in that respect as to exactly what type of caliber of guns were present when everyone was ducking and running for cover. The victim got shot in the back. Right. But it's a limiting principle. I mean, it just seems to me at some point, if you're just looking for firearms, a warrant's got to be stale, even if it's gang-related. What point is that? I think… Is it a year? Is it two years? Is it five years? Is it ten years? Your Honor, I think that is a – it's obviously a difficult question. I don't know what it is. But I mean, we do have to consider that in terms of this context, because if we're saying five-and-a-half months is okay, six – I mean, I don't know how to articulate that after I've thought about it. You do – well, again, I would urge the Court, if the Court is concerned about that issue, to do what it does in other cases, is to say in any… No, I know. But I'm just asking you. You know, I think when you start hitting the year mark, certainly it would be more troubling. I think the other thing to think about, and I cited a case… Would you agree this may be headed towards the outer limit, though? I would, Your Honor. But I think it's still within that limit. And in any event, as I've indicated, I think the magistrate had all of the information. It wasn't like the case cited by the defendant or that I pointed out in my brief in Tennessee where the magistrate wasn't given the dates where everything happened. Here, there was a nexus. There is no allegation that there never was probable cause. And how does the good-faith exception save the warrant if we were to find it was stale? The good-faith exception would be that there's – that the officers or Detective Stewart brought the warrant to a deputy district attorney. He looked at it. He brought it to a magistrate. He signed off. And the exclusionary rule would serve no purpose when staleness is a pretty close question, even if it is at the outer limit or the court finds that. It's still well within the bounds of being not so stale as – so that any reasonable officer would believe that there's no probable cause left. Well, does staleness really apply in a Leon exception? I mean, Leon is directed to the deficiencies in the warrant itself. And this is an execution of – and I realize that sometimes in the execution of a warrant you can have a good-faith exception. But maybe I've missed it. Has Leon been applied in the staleness context? Your Honor, it has in the two – I think the Leon exception that might apply is when no reasonable officer could believe that probable cause exists. And this is an aspect of probable cause finding. Right, exactly. I believe the item to be seized is presently to be found on the premises. Right. And so I think the only time when a Leon – when a Leon might not save a staleness issue is when the officer does not tell the magistrate when everything happens. And so you can think of a hypothetical when they're investigating something that happened 10 years ago, but the warrant makes it appear as if it happened the day before. You know, they're not giving the magistrate all of the evidence to make that – to make the decision as to whether or not probable cause exists. I'm not aware that that case has ever been put before any court. I don't – I'm not aware of any case that – where staleness has not been saved by the good-faith exception where the magistrate has all the tools, simply because it's not in society's interest for the police, when they believe they're looking for this type of evidence, to simply throw up their hands and go home. It's in their interest to put the evidence before a magistrate and say, well, what do you think, Judge? And if the judge signs off and it's not so ridiculous as that a reasonable officer couldn't believe in it, to go forward. Let me ask you one other quick question before you sit down, and that is the – do you think that if the officers had strictly searched for contraband during the detention, that that would be permissible as opposed to weapons? I think it's weapons, Your Honor. Well, I don't know what to make of this, what he's saying. I'm going to pat you down for contraband and weapons. Well, Deputy Anderson said that. Yes. The person who found the crack cocaine first was Deputy Reichenberg. She testified that she was only looking for weapons. The district court credited that testimony. Okay. And that's it. Very good. Thank you. Thank you. To assist the Court in addressing the issue of at what point would this kind of possession of a firearm become stale, I think you have to look to the warrant allegation itself. And if this Court requires the affiant to make a sufficient allegation, then the sufficiency of that allegation will come full circle to help define when it becomes stale. In other words, if the affiant here had said, it's been our experience that gang members will hold on to a weapon for as long as six months or as long as a year, but they won't get rid of it because guns are valuable to them and they can't afford to be disposing of them, an allegation like that would enable this Court to say at what point it becomes stale. But when you have an allegation here, which was not a gang allegation, but an allegation that people who commit assaults with firearms tend to hold on to the instrumentality of the offense and hide it in their house, it doesn't say for how long. And that's why you have this problem, because the allegation itself. Do you think there's an expiration date on that? Is there a point in time where somebody is going to go out and dump the gun? I would think so. I mean, that's what the jurisdiction. If they don't get rid of it quickly. I'm not sure why we'd think five months is a more likely time to get rid of it than three months or one year or anything else. If you've got it hidden someplace, you'll probably leave it hidden in place, wouldn't you? Well, I would think if you have it hidden in your own home, you would want to get rid of it as soon as possible. If you have it hidden in someone's home or business who's unrelated to the activity, then you might leave it there longer. But isn't that the decision for the magistrate to make? And didn't the magistrate have enough information here to make that judgment? Even take the emphasis that the district court made about gang-related activity and so forth. Couldn't the magistrate reasonably draw a conclusion, people who engage in shootouts of this sort probably still have the weapon five and a half months later? That's all of the findings. It's improbable. I think that finding requires some expertise on how gangs operate. And this affiant had expertise in how gangs operate. He didn't choose to put that forth. He just said this was just the generic persons who engage in assaults with firearms, tend to hide their firearms. He didn't talk about how long they hold them. He says that they hide them. Why couldn't the magistrate, in also applying a common-sense approach to that allegation, say, yeah, okay, makes sense to me, which is about all probable cause requires. That's not an elegant way to put it. Well, the Charest court says common sense says they're going to dump the gun as soon as they can. Yeah, but that magistrate probably hadn't read that case. And it's up to that magistrate to look at the totality of the circumstances presented to him or her and conclude, yeah, it's probable that that gun is still there five and a half months later, based upon everything I see in front of me. Well, that is the issue for this Court, to determine whether those facts are sufficient to draw those inferences. What about the armed and dangerous, the problem I was having with the gun? Well, as you know, I briefed that extensively in the reply brief, and I think it is extremely troublesome because they said he was down on his stomach, so presumably they did handcuff him from the back. I think they did say it was back. Yeah. And the man's 45 years, 45 years, excuse me, 55 years old. He's not a young, agile man. So he is handcuffed. So he's handcuffed. He's down on the ground face down. There's no evidence that he's armed or dangerous. Now, the case law where they allow handcuffing, for example, as in Mina, those cases all involve people who have been brought back into the house where there's an allegation that there's a firearm, and, you know, the firearm would be within reach. And so they allow them to be handcuffed. That's a separate issue because he wasn't brought into the house. So we know that isn't the reason for the handcuffing here. But he is handcuffed, and they do a Terry search. They have no reason to believe he's armed or dangerous. He's not the target of this search. And when opposing counsel says that's not factually true, I think it is. They've said they've seen Clarence or Terrence driving the orange car, that Terrence drives the orange car. They saw them putting the guns in the orange car. That all suggests that Terrence is the subject of this, and it's Terrence and his brother who the probation report showed residing at that residence. They clearly are the targets of this. Finally, as to the question the Court asked about Judge Reichen or the Deputy Reichenberg and the weapons, Detective Anderson says, I'm patting you down for guns or weapons. Mr. Toney, trial counsel, asked Reichenberg, is that, are you in agreement with that? Is that what you did? And she said yes. But at an earlier point in time, she said no, no, she was only looking for weapons. She's contradicted herself. But ask yourself this. As she is doing the little squeezes, catching the fabric of his clothing between her fingers, ask yourself, is that a pat down or is that a search under the meaning of Dickerson? Thank you, counsel. Thank you both for your arguments this morning. And if you're briefing in the case, the case will be submitted for decision and will be in recess. Thank you.
judges: Carr, Thomas, Clifton